## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DEBORAH KINDER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>MEREDITH CORP., an Iowa corporation,<br><br>Defendant. | Case No. 1:14-cv-11284<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Deborah Kinder brings this Class Action Complaint against Defendant Meredith Corp. to obtain redress for all persons injured by Meredith's intentional and unlawful disclosure of Plaintiff's and its other subscribers' highly personal and sensitive information. For her Class Action Complaint, Kinder alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

### NATURE OF THE CASE

1.      Meredith is a media company that publishes some of the most widely circulated magazines in the United States, including *Better Homes and Gardens*, *Family Circle*, *Ladies' Home Journal*, *Midwest Living*, and *Fitness*.

2.      To supplement its sales and advertising revenues, Meredith has an entire business division known as Meredith Database Marketing Services

("DBMS"), which compiles and disseminates mailing lists containing its subscribers' personal information—including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as age, income, travel habits, ethnicity, religion and religious habits, political affiliation and more—to third parties.

3.      Meredith's disclosure of such personal, demographic, and lifestyle information is problematic because it allows for the highly specific targeting of groups of individuals. For example, anyone could buy a customer list from Meredith containing the names and addresses of all *Midwest Living* subscribers who live in Warren and are over the age of 65, have an income between $50,000 and $74,999, own cats, and frequently travel internationally.

4.      While Meredith profits handsomely from such practices, it does so at the expense of its subscribers' privacy rights. Meredith does not obtain its customers' consent prior to disclosing their Personal Reading Information.

5.      By disclosing its customers' Personal Reading Information without their consent, Meredith not only disregards its customers' privacy rights, it also violates Michigan's Video Rental Privacy Act, M.C.L. §§ 445.1711 – 15 ("VRPA"), which prohibits companies from disclosing, without permission, any record or information concerning a customer's purchase of written materials if the record identifies the customer.

2

6.     Accordingly, Plaintiff Kinder brings this Class Action Complaint against Meredith for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, for breach of contract, and, in the alternative to breach of contract, for unjust enrichment.

**PARTIES**

7.     Plaintiff Deborah Kinder is a natural person and citizen of the State of Michigan.

8.     Defendant Meredith Corp. is an Iowa corporation with its principal place of business at 1716 Locust Street, Des Moines, Iowa 50309. Meredith does business throughout Michigan and the United States.

**JURISDICTION AND VENUE**

9.     This Court has personal jurisdiction over Meredith because it is registered to do, and regularly does, business in Michigan, including soliciting consumer business from, and entering into consumer transactions with, Michigan consumers. Furthermore, the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated from, Michigan.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one Class member is a citizen of a different state than Defendant; the amount in controversy exceeds $5,000,000.00, exclusive

of interest and costs; and none of the exceptions under that subsection apply to this action.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391(b)(2). Venue is additionally proper because Plaintiff resides within this District in Huron County, and Defendant transacts significant business in this District, including soliciting consumer business and entering into consumer transactions.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

12.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at 7 – 8 (1988) (statements of Sens. Simon and Leahy, respectively).

13.     Recognizing the need to protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of written materials," by prohibiting

4

companies from disclosing certain types of sensitive consumer information. H.B.

No. 5331  1988 Mich. Legis. Serv. 378 (West).

14.    Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.    Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing[,]" and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100-599, at 7 (statement of Rep. McCandless).

16.    As Senator Patrick Leahy recognized in proposing legislation later enacted as the Video Privacy Protection Act, 18 U.S.C. § 2710: "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5397-01 (May 10, 1988).

5

17.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

18.     Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as Exhibit A).

19.     Despite the fact that thousands of Michigan residents subscribe to Meredith publications, Meredith ignores its legal responsibility by systematically violating the VRPA.

### The Personal Information Market:
### Consumers' Personal Information Has Real Value

20.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike

anything we've ever seen in our lifetimes . . . and individuals are concerned about being defined by the existing data on themselves."[1]

21.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

22.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace, and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. *Data is currency. The larger the data set, the greater potential for analysis—and profit*.[3]

23.    A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business

---

[1]    *The Information Marketplace: Merging and Exchanging Consumer Data*, Federal Trade Commission, 8, 11 (Mar. 13, 2001), *available at* http://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Mar. 27, 2014).

[2]    *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, WSJ.com (Feb. 28, 2011, 12:01 AM), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.

[3]    Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable*, Federal Trade Commission, 2 (Dec. 7, 2009), *available at* http://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (emphasis added).

with companies who they believe do not protect their privacy online.[4] Similarly, 81 percent of smartphone users polled said that they avoid using smartphone apps that they do not believe protect their privacy online.[5]

24.     Thus, as privacy concerns grow, consumers are increasingly incorporating privacy values into their purchasing decisions. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[6] Companies viewed as having weaker privacy protections are forced to offer value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

25.     Consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[7] The business models of these

---

[4]     *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last visited Mar. 27, 2014).

[5]     *Id.*

[6]     *See* Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, 22 Information Systems Research no. 2, 254, 255 (2011); *see generally* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 28, 2012), https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy.

[7]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012),

companies capitalizes on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.

26.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[8] As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a less valuable service than what was paid for.

### Data Mining and Information Disclosures:
### Meredith Unlawfully Distributes its Subscribers' Personal Reading Information

27.     Recognizing the value in consumer data, companies known as data miners are thriving in the purchase, trade, collection and sale of massive databases of consumer information. These companies profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[9]

28.     Meredith, through its DBMS division, occupies its own data mining niche. DBMS collects, compiles, and supplements information about Meredith's

---

http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[8]     *See* Il-Horn Hann *et al.*, *The Value of Online Information Privacy: Evidence from the USA and Singapore* (Oct. 2002) at 2, http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

[9]     *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, Time.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/.

subscribers and then discloses mailing lists containing highly detailed information about those subscribers to third parties.

29.    The scope of data miners' knowledge of consumers' private information is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[10]

30.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[11]

31.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the Co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data mining companies, including Meredith, seeking information on how those companies compile, store,

---

[10]    Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html.

[11]    Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, President and Chief Executive Officer, Acxiom (Oct. 9, 2012), *available at* http://commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

and sell their massive collections of consumer data.[12]

32.    In their letter to Meredith, the Co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on almost every U.S. consumer.* This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[13]

33.    Meredith's data mining operation begins by collecting large amounts of data through its consumer book and magazine sales. Meredith then collects more information about its own consumers from other sources, including other data miners. This allows Meredith to profile its customers with a level of granularity matched by few consumer-facing businesses in the country. Through DBMS, Meredith then discloses mailing lists containing highly detailed information about its magazine subscribers and book purchasers.

34.    As a result of Meredith's data-compiling and -sharing practices, companies can purchase and rent mailing lists from Meredith that identify

---

[12]    *See* Katy Bachman, *Lawmakers Open Data Broker Probe: Nine companies queried about 'consumer dossiers,'* AdWeek (July 25, 2012, 1:04 a.m. PDT), http://www.adweek.com/news/advertising-branding/lawmakers-open-data-broker-probe-142185.

[13]    Letter from Edward J. Markey and Joe Barton, Co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Stephen M. Lacy, CEO of Meredith Corp., 1 (July 25, 2012) (attached hereto as Exhibit B).

Meredith's magazine subscribers and book purchasers by their most intimate details: income, religion, religious habits, and political affiliation, and more.

35.    Meredith's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers. For example, Meredith will rent to third parties a list with the names and addresses of all *Midwest Living* subscribers who live in Warren and are over the age of 65, have an income between $50,000 and $74,999, own cats, and frequently travel internationally.

36.    Meredith discloses its customer lists to companies for a variety of purposes. Among these, Meredith discloses mailing lists to other consumer-facing business, and to non-profit organizations soliciting donations, votes, and volunteer efforts.

37.    Meredith discloses this information without subscriber consent, and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is bought and sold on the open market.

38.    Consumers can sign up for Meredith subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, Meredith never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy. Consequently, Meredith uniformly fails to obtain any form of consent from—or

12

even provide effective notice to—its subscribers before disclosing their Personal Reading Information.

39.     As a result, Meredith disclosed and continues to disclose its customers' Personal Reading Information—including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[14]—without their consent and in violation of the VRPA.

40.     Meredith's disclosures are especially troublesome because its mailing lists are often sold and rented to direct-mail advertising companies. In addition to causing waste and inconvenience, direct-mail advertisers often use information from subscriber lists to lure unsuspecting consumers into various scams,[15] including fraudulent sweepstakes, charities, and buying clubs. Thus, Meredith's actions contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[16]

---

[14]     *See California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03.

[15]     *See Prize Offers*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-offers (last visited Mar. 27, 2014).

[16]     Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, at A1, *available at*

41.     Information disclosures like Meredith's are particularly dangerous to the elderly and retirees. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[17] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[18]

42.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Meredith's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of scam, a consumer often is bombarded with similar fraudulent offers from a host of scam artists."[19]

43.     By and through these actions, Meredith has intentionally disclosed its Michigan subscribers' Personal Reading Information to third parties without

---

http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all (last visited Mar. 5, 2014).

[17]     *Id.*

[18]     *Prepared Statement of the FTC on Fraud Against Seniors*, Federal Trade Commission, 1 (Aug. 10, 2000) *available at* http://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Mar. 27 2014).

[19]     *Id.* at 3.

consent, in direct violation of the VRPA and at the expense of Plaintiff and the other members of the Class.

### FACTS RELATING TO PLAINTIFF DEBORAH KINDER

44.     Plaintiff Deborah Kinder is a citizen of the state of Michigan.

45.     Kinder subscribes to *Better Homes and Gardens*, *Ladies' Home Journal*, *Family Circle*, and *Midwest Living*.

46.     *Better Homes and Gardens*, *Ladies' Home Journal*, *Family Circle*, and *Midwest Living* are magazines published, owned, and operated by Meredith.

47.     Kinder has never agreed to allow Meredith to disclose her Personal Reading Information to anyone.

48.     Kinder did not receive any notice before Meredith disclosed her Personal Reading Information.

49.     However, Meredith has disclosed—and continues to disclose—without consent or prior notice, Kinder's Personal Reading Information (*i.e.*, information that identifies Kinder as a *Better Homes and Gardens*, *Ladies' Home Journal*, *Family Circle*, or *Midwest Living* subscriber) to third parties, including other data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

50.     Because Meredith disclosed her Personal Reading Information, Kinder now receives additional unwanted commercial solicitations and

advertisements. These offers waste Kinder's time, money, and resources, and cause her emotional distress, including irritation, annoyance, and anxiety and fear that her personal information will fall into the hands of thieves and scammers. Meredith's disclosure of Kinder's Personal Reading Information directly contributed to the increase in unwanted solicitations and advertisements Kinder received.

51.    Additionally, because Kinder is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Meredith's disclosure of Kinder's Personal Reading Information deprived Kinder of the full set of benefits to which she was entitled as part of her *Better Homes and Gardens*, *Ladies' Home Journal*, *Family Circle*, and *Midwest Living* subscriptions, thereby causing her economic harm.

52.    Accordingly, what Kinder received (subscriptions without privacy protections) was less valuable than what she paid for (subscriptions with accompanying privacy protections), and she would not have been willing to pay as much, if at all, for her subscriptions had she known that Meredith would disclose her Personal Reading Information.

## CLASS ACTION ALLEGATIONS

53.    **Class Definition:** Plaintiff brings this action on behalf of herself and a proposed Class, defined as follows:

16

All Michigan residents who had their Personal Reading Information disclosed to third parties by Meredith Corp. without consent.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant, and (5) the legal representatives, successors, or assigns of any such excluded person.

54. **Numerosity:** The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder of each Class member is impracticable. Defendant has deceived, and profited from disclosing the Personal Reading Information of, thousands of consumers who fall into the definition set forth above. Ultimately, members of the Class will be easily identified through Defendant's records.

55. **Typicality:** Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

17

56.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class members, and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other Class members.

57.    **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

> (a)    Whether Meredith is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);
>
> (b)    Whether Meredith obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information;
>
> (c)    Whether Meredith's disclosure of Plaintiff's and the Class's Personal Reading Information violated the Video Rental Privacy Act, M.C.L. § 445.1712;
>
> (d)    Whether Meredith's disclosure of Plaintiff's and the Class's Personal Reading Information constitutes breach of contract; and

(e)  Whether Meredith's disclosure of Plaintiff's and the Class's Personal Reading Information constitutes unjust enrichment.

58.  **Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all Class members is impracticable. The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the Class members to obtain effective relief from Defendant's misconduct on an individual basis. Even if Class members could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

59.  **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making final injunctive relief appropriate with respect to the

Class as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

60.     Plaintiff reserves the right to revise the definition of the Class as necessary based upon information learned in discovery.

### FIRST CAUSE OF ACTION
### Violation of the Video Rental Privacy Act
### (M.C.L. § 445.1712)
### (On Behalf of Plaintiff and the Class)

61.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

62.     As a seller of books, individual magazines, and magazine subscriptions directly to consumers, Meredith is engaged in the business of selling written materials at retail. M.C.L. § 445.1712.

63.     By subscribing to *Better Homes and Gardens*, *Ladies' Home Journal*, *Family Circle*, and *Midwest Living*, Kinder purchased written materials directly from Meredith. M.C.L. § 445.1712.

64.     Because Kinder purchased written materials directly from Meredith, she is a "customer" within the meaning of the VRPA. M.C.L. § 445.1711(a).

65.     At all times relevant, and beginning on the date Kinder initiated her first Meredith subscription, Meredith disclosed Kinder's Personal Reading

20

Information, which identifies her as a *Better Homes and Gardens*, *Ladies' Home Journal*, *Family Circle*, or *Midwest Living* subscriber, in a number of ways, including to other data miners, direct-mail advertisers, and to organizations soliciting monetary contributions, volunteer work, and votes.

66.     By disclosing its subscriber lists, Meredith disclosed to persons other than Kinder, records or information concerning her purchase of written materials from Meredith. M.C.L. § 445.1712.

67.     The information Meredith disclosed indicates Kinder's name and address, as well as the fact that she subscribed to *Better Homes and Gardens*, *Ladies' Home Journal*, *Family Circle*, or *Midwest Living*. Accordingly, the records or information disclosed by Meredith indicate Kinder's identity.

68.     Kinder never consented to Meredith disclosing her Personal Reading Information to anyone.

69.     Worse still, Kinder did not receive notice before Meredith disclosed her Personal Reading Information to third parties.

70.     On information and belief, Meredith's disclosures of Kinder's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

71.     Meredith's disclosures of Kinder's Personal Reading Information were not made to collect payment for her subscriptions.

72.     Meredith's disclosures of Kinder's Personal Reading Information were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, membership, and votes—all in order to increase Meredith's revenue. Accordingly, Meredith's disclosures were not made for the exclusive purpose of marketing goods and services directly to Kinder.

73.     By disclosing Kinder's Personal Reading Information, Meredith violated Kinder's common law right to privacy.

74.     By disclosing Kinder's Personal Reading Information, Meredith violated Kinder's statutorily protected right to privacy in her reading habits. M.C.L. § 445.1712.

75.     Additionally, because Kinder paid for her Meredith subscriptions, and Meredith was obligated to comply with the VRPA, Meredith's unlawful disclosure of Kinder's Personal Reading Information deprived her of the full value of her paid-for subscriptions. Because Kinder ascribes monetary value to the privacy of her Personal Reading Information, Meredith's unlawful disclosure of her Personal Reading Information caused her to receive less value than she paid for, thereby causing her economic harm.

76.     Likewise, because Kinder and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine

subscription that keeps their Personal Reading Information private is more valuable to them than one that does not.

77.     Accordingly, had Kinder been adequately informed of Meredith's disclosure practices, she would not have been willing to purchase her Meredith subscriptions at the price charged, if at all. Thus, Meredith's unlawful disclosures caused Kinder economic harm.

78.     Meredith's disclosure of Kinder's Personal Reading Information to third parties has also caused an influx of third-party solicitations and advertisements, causing emotional distress in the form of irritation, aggravation, anxiety, and fear that her information will be obtained and misused by thieves and scammers.

79.     As a result of Meredith's unlawful and continued disclosure of their Personal Reading Information, Kinder and the other Class members have suffered privacy and economic injuries. On behalf of herself and the Class, Kinder seeks: (1) an injunction requiring Defendant Meredith to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the VRPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

## SECOND CAUSE OF ACTION
### Breach of Contract
### (On Behalf of Plaintiff and the Class)

80.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

81.     Meredith offered to sell magazine subscriptions to Kinder and the other Class members for specific prices.

82.     Kinder and the other Class members accepted Meredith's offers by agreeing to pay the offered prices as consideration for purchasing the magazine subscriptions.

83.     Accordingly, Meredith entered into binding contracts for magazine subscriptions with Kinder and the other Class members.

84.     Because the laws existing at the time and place of the making of a contract are incorporated into it, the contracts between Meredith and Kinder and the other Class members include obligations for the parties to abide by all applicable laws, including the VRPA.

85.     Kinder and the other Class members performed their obligations under the contracts by paying the consideration owed to Meredith for the purchase of their magazine subscriptions, and by complying with all applicable laws.

86.     The ability to control disclosure of sensitive personal information (such as Personal Reading Information) is material to any consumer transaction

24

because it is likely to affect a consumer's decision to, or conduct regarding, purchase of a product or service.

87.     Meredith's failure to perform its contractual obligations imposed by the VRPA—i.e., maintaining the confidentiality of subscribers' Personal Reading Information—constitutes a material breach by Meredith of its contracts with Kinder and the other Class members.

88.     Kinder and the other Class members have suffered actual damages as a result of Meredith's breach in the form of the value Kinder and other Class members attributed to the ensured confidentiality of their Personal Reading Information, as required by the VRPA. Because Kinder and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—they incurred actual monetary damages.

89.     Additionally, because Meredith profited from its breach, Kinder and the other Class members are entitled to disgorgement of all profits obtained by Meredith from its unlawful disclosure of its subscribers' Personal Reading Information.

90.     Accordingly, Kinder and the other Class members seek an order declaring that Meredith's conduct constitutes breach of contract, and awarding

25

Kinder and the Class disgorgement of Meredith's unlawfully obtained profits, and damages in an amount to be declared at trial.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### In the Alternative to Breach of Contract
### (On Behalf of Plaintiff and the Class)

91.     Plaintiff incorporates the allegations contained in paragraphs 1 through 79 as if fully set forth herein.

92.     Kinder's claim for unjust enrichment is brought in the alternative to her claim for breach of contract.

93.     Kinder and the Class members conferred benefits on Meredith by providing Meredith with their Personal Reading Information and paying Meredith for their magazine subscriptions. Meredith received and retained the information and money belonging to Kinder and the Class when they subscribed to Meredith publications.

94.     Because Meredith received and processed Kinder's and the Class's subscription payments and Personal Reading Information, and because Meredith has employees handling customer accounts and billing as well as customer data, Meredith appreciated or has knowledge of such benefits.

95.     Under the VRPA, Kinder and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

96.     Under principles of equity and good conscience, because Meredith failed to comply with the VRPA, Meredith should not be allowed to retain the full amount of money Kinder and the Class paid for their subscriptions, or the money it received by disclosing Kinder's and the Class's Personal Reading Information.

97.     Kinder and the other Class members have suffered actual damages inasmuch as Meredith's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

98.     Further, a portion of the purchase price of each Meredith magazine subscription sold to Kinder and the other Class members was intended to ensure the confidentiality of Kinder's and the other Class members' Personal Reading Information, as required by the VRPA. Because Kinder and the other Class members were denied services they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual monetary damages.

99.     To prevent inequity, Meredith should return to Kinder and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Meredith's disclosure of Kinder's and the Class's Personal Reading Information.

27

100.    Accordingly, Kinder and the Class members seek an order declaring that Meredith's conduct constitutes unjust enrichment, and awarding Kinder and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Meredith through its disclosure of Kinder's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Deborah Kinder, on behalf of herself and the Class, pray that the Court enter judgment in her favor and against Meredith and for the following relief:

(1)    Certify the Class as defined above, appoint Plaintiff as Class Representative, and designate her counsel as Class Counsel;

(2)    Declare that Meredith's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

(3)    Declare that Meredith's conduct as described herein constitutes breach of contract or, in the alternative to breach of contract, unjust enrichment;

(4)    Award actual damages, including disgorgement, or $5,000.00, whichever is greater, to each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

(5)    Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Meredith to cease the unlawful disclosures discussed herein;

(6)    Award of reasonable attorneys' fees, interest and costs, M.C.L. § 445.1715(b); and

(7)    Such other and further relief as the Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: March 28, 2014                          Respectfully submitted,

                                               **Deborah Kinder**, individually and on behalf of all others similarly situated

                                               By: <u>s/ J. Dominick Larry</u>
                                                      One of her attorneys

Henry M. Scharg – P28804
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
302 W. Main Street
Northville, Michigan 48167
Tel: 248.596.1111
Fax: 248 496.1578

Ari J. Scharg
ascharg@edelson.com
J. Dominick Larry
nlarry@edelson.com
Mark S. Eisen
meisen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff Deborah Kinder and the putative class*